# Relms Corporation v. The Borough of Indiana

*Michael Handler*, for plaintiff.
*W. Parker Ruddock*, for Borough of Indiana.
*Alan Holsinger*, for Township of White.

EARLEY, *J.*, July 20, 1981—This matter is before the court on de novo hearing on three cases consolidated by the court because the cases present common questions of law and fact. Relms moved for declaratory judgments of its rights against White Township and the Borough of Indiana and appealed a decision of White Township under the Administrative Agency Act.

Relms is claiming as against White Township

that it had no authority to enter into a contract whereby Relms was granted exclusive franchise rights to provide cable television services within the township and that the township unreasonably refused to grant approval of a rate increase proposed by Relms. Against the Borough of Indiana, Relms is advancing a number of claims, all of which, except its claim that the borough unreasonably rescinded approval of a rate increase proposed by Relms, have been rendered nonjusticiable by the stipulation by Relms at oral argument of the borough case that the outcome of the township case would control the borough case.

The court holds that Relms has failed to demonstrate that the refusal of the township to grant approval to a rate increase proposed by Relms and the rescission of approval by the borough of a rate increase proposed by Relms were unreasonable. Subsumed in this holding is that White Township has authority, similar to that of the borough, whose authority was not contested by Relms, to grant exclusive franchise rights for the provision of cable television services within the borough.

## FINDINGS OF FACT

Relms Corporation was granted by contract exclusive rights to provide cable television service in the Borough of Indiana and the Township of White.

Service began in White Township in 1966 pursuant to a contract which ran for ten years and which specified a base rate for services of $4.50 per month per customer. The contract provided that no rate increases would be made by Relms without the approval of the Board of Supervisors of the township. Agreement, Paragraph 11. The contract was renewed for another ten year period in 1976 without

changes in the provisions, other than the rate to be charged customers.

Two increases in rates were requested by Relms during the first ten year period and approved by the township. The second request was originally denied by the township, but approved about four months later. The base rate charged for services at the end of the first ten year period was $6 per month per customer.

In 1978, another rate increase to $6.50 per month per customer was granted to Relms and this is the existing rate charge. In June of 1980, Relms requested a further increase to $7.30 per month which was refused approval by the township Board of Supervisors. Relms appealed to the supervisors for reconsideration and the township again refused approval in January of 1981.

The procedure throughout these two contract periods whereby Relms would seek approval for rate increases was consistent. Relms would request an increase and the township would hire a certified public accountant to examine the corporate books. There would be a meeting between the parties and the township would then make a decision on the request. The procedure was mutually satisfactory to the parties for the entire period, Relms having exercised its option to renew the contract for the second ten year period without changes in the provisions of the agreement, until the most recent request for a rate increase was denied.

Relms based its request for an increase on a claimed low rate of return on investment. Relms claims to have received a return on investment of 17.18 percent in 1977; 12.3 percent in 1978; 11.94 percent in 1979; and 8.46 percent in 1980. The figures, whose mathematical accuracy is not con-

tested by the township or the borough, were derived from the ratio of net income to total assets. Relms claims that these rates of return are too low when measured by the cost of capital, which Relms equates with the cost of borrowing money. Relms failed to inform the court of its actual costs of borrowing money.

The township contests the validity of the accounting method, preferring a ratio of net income to property, plant and equipment. The township claims that Relms received a rate of return on investment of 21.5 percent in 1977; 15.8 percent in 1978; 15.9 percent in 1979; and 13.1 percent in 1980. Relms does not dispute the mathematical accuracy of the figures.

Both parties agree that there were major capital expenditures of approximately $139,000 made by Relms in 1980 to acquire two new channels and to extend cable lines beyond the boundaries of the township. Defendant's Exhibit 1 indicates that the bank interest rate for this capital was 11 percent in November, 1979, rising to 15 percent in June of 1980. Relms offered no explanation for the variable rates. The accountant for Relms concedes that the 1980 rate of return would drop because major capital expenditures were made in that year.

Relms concedes that it is a closely held corporation with four shareholders, each holding an office in the company, owning 45 percent of the stock and Monessen Amusement Company owning the remainder.

The President works full time on corporate matters and received a salary of $41,000 in 1979 and a salary of $52,000 in 1980.

The Vice President has no office or regular hours, working on call and spending at most 10 hours per

week on corporate matters, and received a salary of $21,000 in 1979 and a salary of $22,000 in 1980.

The treasurer is located outside the state, giving occasional opinions on corporate matters by telephone and checking the financial status of the company, and received a salary of $28,500 in 1979 and a salary of $30,000 in 1980. The secretary is located outside the state, giving occasional opinions on corporate matters by telephone, and received a salary of $14,250 in 1979 and a salary of $15,000 in 1980.

The accountant of Relms concedes that it is normal practice in a closely held corporation for the owners to take profits in the form of salaries in order to avoid double taxation of dividends. With the exception of a portion of the President's salary and a portion of the Vice President's salary, the facts discussed above indicate that the owners are following that practice in this case.

The ratio of administrative salaries to total expenses was 23 percent in 1978 ($77,000/$333,000); 27 percent in 1979 ($103,000/$379,000); and 26 percent in 1980 ($120,000/$453,000).

Relms does not maintain separate records for the different areas it services sufficient to enable Relms to make a cost/expense breakdown for each different area.

## DISCUSSION

From the foregoing facts, several things are apparent. First, Relms has no grounds to complain about the township's authority to regulate cable television rates. Second, there was no procedural defect in the manner in which the township ultimately refused approval to Relms' request for a rate increase. Third, Relms has failed to demonstrate

that the township's refusal to permit the rate increase was arbitrary or capricious.

The starting point in the analysis of the rights and duties of these parties is, of course, the contract. Relms entered into a contract with the township to supply cable television services to residents at a given rate. The contract specified that (a) the monthly service rates would not exceed the rates set by the contract and (b) no changes in rates charged to subscribers would be made by Relms without prior application to and approval of the township. In return, Relms received an exclusive grant from the township to use and occupy the streets, alleys, public ways and places for cable television purposes, excepting any rights or interests which the township could not, by law, convey.

Now, after having received the benefit of its exclusive contract for nearly fifteen years and entrenching itself in the local cable television market, Relms wishes to contest the authority of the township to enter the contract. This Relms cannot do. Relms is a party to the contract and has derived benefit from the contract. Thus, Relms has no grievance against the township in the sense that Relms simply cannot claim a harm to itself from the township's action in entering the contract. Relms is therefore precluded from raising this issue since Relms is unable to claim any direct harm from the township's action in entering the contract. See William Penn Parking Garage, Inc. v. City of Pittsburgh, 464 Pa. 168, 346 A. 2d 269 (1975). Relms' actual grievance is that the township failed to grant the requested rate increase and thus focuses on the township's actions pursuant to the contract. But Relms cannot say that it has been harmed by the action of the township in entering the contract it-

self and Relms thus has no standing to raise the issue.

Furthermore, the doctrine of equitable estoppel precludes a party, such as Relms, who has actively participated in the alleged wrongdoing from obtaining relief based on the wrongful action. See Contel Construction Corp. v. Parker, 261 F. Supp. 428 (1966). Where, as here, a party has sought to contract with a township for its own economic gain and then entered into that contract for its own economic gain, it cannot be heard to demand that the contract be nullified based on the subterfuge that the township wrongfully entered into the contract in the first place simply because it is no longer as economically advantageous as that party would like.

Thus, regardless of whether some other person would have standing to raise this issue of the township's authority to contract for cable television services, Relms does not have that standing.

The notion that Relms is advancing, i.e., that a second class township has no authority to contract for the provision of cable television services and, in that contract, to require the operator to obtain approval prior to increasing rates, is without merit.

The township possesses similar powers to those of the Borough to regulate its streets, alleys, public ways and places: 53 P.S. §66101 et seq. It was these regulatory powers over the public roads which served as the foundation for the Pennsylvania Supreme Court to find the power in a borough to grant an exclusive cable television franchise and to control the charges made by cable television companies: Borough of Scottdale v. National Cable Television Corp., 476 Pa. 47, 381 A. 2d 859 (1977). The township has no less authority merely because it is a second class township whose powers are limited to

those explicitly granted by the legislature. The power over public ways being sufficient authority to control cable television charges by a borough, it is likewise sufficient authority to control cable television charges by a township.

Moreover, the general powers statute, 53 P.S. §65762 grants a second class township the authority to adopt ordinances not inconsistent with the Constitution necessary for the proper management, care and control of the township and the maintenance of the welfare of the township and its trade. Cable television service is an important need of the inhabitants of White Township. That the township government stepped in to see that this need was satisfied is not unreasonable action by that government, nor is such an action inconsistent with the Constitution. Surely it is better for the proper management, care and control of the township, and the maintenance of the welfare of the township, and its trade, for the township to regulate the stringing of cable wires along and over its public ways. Having sound reasons to regulate the installation of cable television, it is far from unreasonable for the township to exact a price for the orderly use of existing poles and public ways by demanding that an operator seek its approval prior to raising charges to customers. Relms was free to establish its franchise elsewhere if it did not like this provision.

The federal, state and county governments having failed to act in this area, the duty to act may be borne by the local municipal government.

Finally, what reason would the legislature have to allow a borough to regulate cable television companies and control their charges while, at the same time, deny such power to a second class township? The answer is clearly none. Our legislature did not intend the result that the Borough of Indiana could regulate the orderly installation of cable television

lines and exact a contractual price of control over rate increases in return for the grant of an exclusive franchise while the Township of White, which completely surrounds the borough, would be left to unregulated competition, with cables wires strung here and there, and with no local governmental control over rate increases. Due process and equal protection notions dictate equal treatment for citizens of boroughs and townships alike.

Therefore, the court finds that the township possesses the authority to enter into contracts to grant exclusive cable television franchises and to control charges made by cable television companies: Borough of Scottdale v. National Cable Television Corp., supra. The authority of the borough to do the same is not questioned by Relms.

The question remains as to the reasonableness of the two governments' actions in refusing to allow Relms to increase its rates.

Under the terms of the contracts, which were renewed for a ten year period in 1976, Relms can claim no more than that it is entitled to receive the contractual price for its services unless the respective government approved a rate increase. In that case, Relms can claim that it is entitled to receive the approved rate. Under the contract terms, Relms is neither entitled to, nor guaranteed a rate increase regardless of its financial circumstances.

Notwithstanding the contract provisions, Relms has failed to demonstrate that the refusal of the township and the borough to grant it a rate increase were unreasonable. Relms cited an 8.46 percent rate of return on investment as proof that the refusal was unreasonable. However, Relms failed to consider that its cited rate included a nonrecurring capital expenditure of $139,000 in 1980 in a business with total income for 1980 of $505,000, and further failed to consider its administrative salaries

in the cited figures, which amounted to $120,000 for 1980 and $103,000 for 1979, or 26 percent and 27 percent, respectively, of its total expenses for those years. The 8.56 percent figure fails to take into account that a substantial portion of the salary amounts, were salaries taken in lieu of dividends.

Relms' arguments concerning the procedure used by the township are without merit. The township hired an accountant to review Relms' books and met with Relms on the matter. The decision to deny the requested rate increase was denied at an open and regularly scheduled board meeting which Relms had the opportunity to attend. The fact that Relms did not get its requested rate increase, however, is not a sufficient reason to find the procedure defective: Local Agency Law, 2 P.S. §551, et seq. Finally, the court has held a de novo hearing, which makes this issue meaningless: Administrative Agency Act, 2 P.S. §751 et seq.

Wherefore, the court makes the following

### ORDER

And now, July 20, 1981, plaintiff's motion for a declaratory judgment is hereby denied, and the actions of the Indiana Borough Council and White Township Supervisors in denying plaintiff's requested rate increase are hereby affirmed.